Shields, Justice, delivered the opinion of the court: The plaintiff in error was indicted in the circuit court of Adams county, for harboring and secreting a negro slave. The indictment contained several counts. The first count charges, “that Richard Eells, on etc., at etc., a certain negro, the same being a slave of the state of Missouri, and owing service to one Chauncy Durkee, of said state of Missouri, then and there in said county of Adams, unlawfully did secrete,” etc. The second count charges “ that said Eells, on etc.; at etc., a certain negro slave, owing .labor to one Chauncy Durkee, and being the property of the said Chauncy Durkee, then and there did harbor,” etc. The third count charges “ that the said Eells, on etc., at etc., a certain other negro slave, owing labor in the state of Missouri, and having secretly fled from such state, and from the said Chauncy Durkee, his master, then and there unlawfully did secrete,” etc. The fourth count charges “that the said Eells, did unlawfully secrete a negro slave.” And, The fifth count charges “ that the said Eells, on etc., at etc., a certain other negro slave, of and from the state of Missouri, and having fled from the custody of one Chauncy Durkee, and .owing service to the said Chauncy Durkee, of said state of Missouri, the said Chauncy Durkee then and there being the lawful owner of said negro slave, then and there in the said county of Adams, unlawfully did prevent the said Chauncy Durkee, being the lawful owner of said slave as aforesaid, from re-taking him, the said slave, in a lawful manner, by secreting him, the said negro slave, contrary to the form of the statute in such case made and provided,” etc. A motion was made by the defendant below to quash this indictment. The court sustained the motion as to the fourth count, and overruled it as to the others. The defendant then pleaded not guilty. A trial was had and a verdict of guilty returned by the jury. The defendant entered his motion in arrest of judgment. The court overruled the motion, and rendered [*509] judgment against him, and assessed his fine at the sum of $400. To reversethis judgment the defendant prosecuted his writ of error to this court, and assigns for error the judgment of the court. First. In not sustaining the motion to quash the indictment; Second. In not sustaining the motion in arrest of judgment. In reviewing the decision of the court below upon the motion, the objections made to the form of the indictment will be first considered. The first objection which appears in the record, is the omission to insert the name of the slave in the indictment, ' He is described as “a certain negro slave,” the property of Chauncy Durkee, a resident of Missouri, and it is objected that this description is not sufficient. This omission does not affect in any degree the rights of the defendant. Upon a second trial for the same offence, he can give parol proof of the identity of the slave, and this proof would be equally necessary, in such case, if the name of the slave were inserted in the indictment. The description would be held sufficient in an indictment for larceny, and is therefore sufficient in an indictment like the present. The next objection is also a formal.one, and is founded upon the want of an allegation of the scienter in the instrument. It is said the defendant, to be guilty of the offence, must have knowledge of the fact that the person harbored or secreted was, at the time, a slave, and the propertj of another, and that this knowledge must be averred in the indictment, and proved on the trial. The case of Birney v. The State of Ohio, 8 Ohio, 238, is cited in support of this position. The court in that case says, that “ This knowledge should have been averred in the indictment, and proved on'the trial, for without such knowledge, the act charged as a crime was innocent in its character.” This reasoning is based on the supposition that knowledge of the fact that the negro is a slave, and the property of another, constitutes the essence of the offence. This supposition is incorrect. The mere knowledge of this fact is not the essence of the offence. It may be an act of humanity, in many cases, to afford shelter and succor to a slave, while knowing him to be a slave, and the property of another. The essence of the offence consists in the attempt to defraud the .owner of his property ; and the words harbor and secrete have, by long usage in connection with this subject, acquired a specific meaning, which includes both act and intention. This court has taken this view of the signification of these words, in the case of Chambers v. The People, ante 351, decided at the present term. This obvious signification of these words was wholly overlooked by the supreme court of Ohio, in the case referred to, and the decision is therefore of little authority in any court which desires to apply the principle of construction recognised by the usage of those states which are accustomed to legislate upon the subject. This indictment is, besides, in the exact language [*510] of the statute, and our law expressly provides that every indictment shall be considered sufficiently technical and correct, which states the offence in the terms and language of the code, or so plainly that the nature of the offence may be easily understood by the jury. The objections therefore to the form of the indictment are not tenable. The next objection is of a more serious nature. It is insisted that the law upon which the indictment was framed is void, being in conflict with the third paragraph of the 2d section of the 4th article of the federal constitution, which declares that no person held to service or labor in one state, under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up on claim of the party to whom such service or labor may be due.” This prohibits the states from passing any law which may interfere with the right of the master to the service of his fugitive slave. Such a law would be absolutely void. The right of the master to his slave is as perfect in'the state' in which the fugitive is found, as in the state from which he has fled. He can seize and re-capture him, if the same can be done without a breach of the peace. In the case of Prigg v. The Commonwealth of Pennsylvania, Judge Story, who delivered the opinion of the majority of the court, says: “ Upon this ground we have not the slightest hesitation in holding that, under and in virtue of the constitution, the owner of a slave is clothed with entire authority, in every state of the Union, to seize and re-capture liis slave whenever he can do it without any breach of the peace, or any illegal violence.” If the owner cannot recover his slave by re-capture, he must resort to his legal claim or demand, and on such claim the slave is to be “delivered up.” Judge Story, in the same case, says: “They (the owners) require the aid of legislation to protect the right, to enforce the delivery, and to secure the subsequent possession of the slave. If indeed the constitution guaranties the right, and if it requires the delivery, upon the claim of the owner (as cannot be doubted), the natural inference certainly is, that the national government is clothed with the appropriate authority and functions to enforce it.” The national government has exercised this authority, and by virtue of an act of congress of the 12th of February, 1793, a uniform remedy, which is perhaps ample and sufficient for the present, is afforded to all claimants of fugitive slaves throughout the Union. Previous to the passage of that law, the fugitive was “ to be given up” on the claim' of the owner, and it was incumbent on the state to see the claim enforced by its own legislation, and its own officers. This duty, it is true, might be neglected by a state. It might disregard its obligation to its sister states. It might refuse to enforce a right which it had recognised, and the [*511] national government could not compel it to act in the premises; but the moral and political obligation of the state, to legislate for the enforcement of this right, would be as-strong and binding as its obligation to legislate in favor of any other right. Judge Story, in the case already alluded to, thinks that the power of legislation on this subject is exclusive in congress. I think his reasoning on this point not entirely conclusive. He says: “Whenever the right was acknowledged, and the duty enforced in any state, it was a matter of comity and favor, and not as a matter of strict moral, political or international obligation or duty.” The right was secured by the national compact. This compact was obligatory upon all the states, and I think it was much more than “a matter of comity and favor;” that it was a matter of strict moral, political and international obligation and duty, which rested upon each state, to enforce the right. Chief Justice Taney, who concurred with Judge Story, in the decision of the case already referred to, delivered a separate opinion, and his view of this matter seems to be more consonant with that nice and delicate principle, which must be applied to the adjustment of the boundaries of jurisdiction between the state and federal governments. He says: “The words of the article directing that the fugitive shall be delivered up, seem evidently designed to impose it as a duty upon the people of the several states to pass laws to carry into execution, in good faith, the compact into which they thus solemnly entered with each other. The constitution of the United States, and every article and clause in it, is a part of that law of every state in the Union, and is the paramount law. The right of the master, therefore, to seize his fugitive slave, is the law of each state, and no state has the power to abrogate or alter it; and why may not a state protect a right of property acknowledged by its own paramount law?” In this reasoning I heartily concur. The duty of the states to legislate upon the subject, in the absence of all national legislation did not make it necessary by any means for the national government “to rely for the due fulfillment of its own proper duties and the rights which it intended to secure upon state legislation, and not upon that of the Union. In 1793, congress legislated upon this subject, and it is contended that this national legislation supersedes all state legislation upon the same subject. On this Judge Story says: “If this be so, then it would seem upon just principles of construction, that the legislation of congress, if constitutional, must supersede all state legislation upon the same subject, and by necessary implication, prohibit it; for if congress have a constitutional power to regulate a particular subject, and they do actually regulate it in a given manner, and in a certain form, it cannot be that the state legislatures 'have a right to interfere, and as [* 512] it were, by way of complement to the legislation of congress, to prescribe additional regulations, and what they may deem auxiliary provisions for the same purpose.” If the meaning of this is that the states are prohibited from passing any law repugnant to the provisions of the act of congress, or interfering in any way with the remedy given by that act for the recovery of fugitive slaves, I think it reconcilable with a just apprehension of the legitimate powers of state governments; but if it is intended to mean that a state has no right to legislate on the subject matter of fugitive slaves, merely because congress has already legislated on the same subject, then I am compelled to regard all this reasoning as the mere obiter dicta of a judge, and that, too, on 'a point not properly involved in the case before the court at the time. But the question for the immediate consideration of this court is whether the 149th section of the criminal code of this state is in conflict with that portion of the article in the federal constitution already alluded to in relation to fugitive slaves. This section in the criminal code declares that “if any person shall harbor or secrete any negro, mulatto or person of color, the same being a slave or servant, owing service or labor to any other persons, whether they reside in this state or any other state or territory or district within the limits and under the jurisdiction of the United States, or shall in any wise hinder or prevent the lawful owner or owners of such slaves or servants from retaking them in a lawful manner, every such person so offending shall be deemed guilty of a misdemeanor, and fined not exceeding five hundred dollars, or imprisoned not exceeding six months.” This law does not tend either directly or indirectly to discharge the slave from any service or labor due to the owner. Neither does it interfere .either directly or indirectly with the rights of the master. It is therefore free from any objection to its constitutionality in this respect. It does not interfere either with the remedy given by Congress for the recovery of the slave, or with the mode of prosecuting that' remedy. It neither aids nor impedes the owner in the reclamation of his property. It neither acts upon the master or the slave; the rights or the remedy; it merely acts upon the citizens of our own state. It does not, even, “by way of complement to the legislation of congress,’-’ prescribe additional regulations or auxiliary provisions, for the recovery of the slave, and it must be by a very strained construction — a construction which would lead to the utter annihilation of state sovereignty, by which such a law can be supposed to be unconstitutional. This law prescribes a rule of conduct for our own citizens. If the state can do this, and I hardly think the power questionable, it can punish those who violate the rule. If a state has power to regulate its own affairs, it has the power to define offences and punish offenders. The object which the legislature may have had in view in passing the law is not [*513] a necessary subject of enquiry before this court. It may have been enacted with the intention of deterring our citizens from interfering with the rights of the master to his property in slaves; if so, the object was a legitimate one and wisely intended to check unwarrantable interference with rights which are guaranteed by the sacred compact which holds ns together as a nation. It may have been, and most likely was, to prevent the influx of that most unacceptable population; but it matters not what the object was, the exercise of the power was within the legitimate scope of state authority, and the necessity for its exercise cannot be enquired into by a court of justice. Judge Story, in the opinion so often alluded to, while asserting for congress the exclusive power to legislate in relation to fugitive slaves, fully recognises the power of the states'to legislate in all cases similar to the one now under consideration. “ To guard, however (he says), against any possible misconception of our views it is proper to state that we are by no means to he understood, in any manner whatsoever, to doubt or to interfere with the police power belonging to the states, in virtue of their general sovereignty. That police power extends over all subjects w.ithin the territorial limits of the states, and has never been conceded to the United States. It is wholly distinguishable from the right and duty secured by the provision now under consideration,-which is exclusively derived from and secured by the constitution of the United States, and owes its whole efficacy thereto. We entertain no doubt whatsoever that the states, in virtue of their general police power, possess full jurisdiction to arrest and restrain runaway slaves, and remove them from their borders, and otherwise to secure themselves against their depredations and evil example, as they certainly may do in the cases of idlers, vagabonds, and paupers. The rights of the owners of fugitive slaves are in no just sense interfered with or regulated by such a course, and in many cases the operation of the police power, although designed essentially for other purposes, for the protection, safety, and peace of the state, may essentially promote and aid the interests of the owners; but such regulations can never be permitted to interfere with or to obstruct the just rights of the owner to reclaim his slave, derived from the constitution of the United States, or with the remedies prescribed by congress to aid and enforce the same.” This qualificatory language of that learned judge covers the case before the court. This power is one of internal police regulation, and that power, as Judge Story says, “ extends over all subjects within the territorial limits of the states.” The police power of a state embraces the power of regulating the whole internal affairs of a state and its civil and criminal polity. In the case of the City of New York v. Miln, 11 Peters 142, Judge Barbour, who delivered the opinion of the court, says: “We think it as competent and necessary fur a state to provide precautionary measures against the [*514], moral pestilence of paupers, vagabonds, and possibly convicts, as it is to guard against the physical pestilence which may arise from unsound and infectious articles imported, or from a ship, the crew of which may be laboring under an infectious disease.” If a state can use precautionary, measures against the introduction of paupers, convicts, or negro slaves, it can undoubtedly punish those of its citizens who endeavor to introduce them. This is the power which the state of Illinois has exercised in the enactment of the law under consideration. It is also said that this law may punish a man twice for the same offence. There is no force whatsoever in this objection. The offences are separate and distinct;, violations of distinct and and different laws, and the punishment inflicted by different sovereignties. It is the opinion of the court that the objections taken to this indictment, and the law upon which it is founded, are not tenable. The judgment below is therefore affirmed with costs.